GERALD F. MANNION, JR., Plaintiff and Counterdefendant-Appellant, v. STALLINGS & COMPANY, INC., Defendant and Counterplaintiff and Third-Party Plaintiff-Appellee (Mannion Mechanical Services, Inc., Third-Party Defendant-Appellant).

First District (1st Division)   No. 1—89—0941

Opinion filed September 24, 1990.

Donald L. Johnson, of Chicago, for appellants.

Burke & Burke, Ltd., of Chicago (John M. Burke, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

This appeal arises from an action brought by Gerald F. Mannion (Mannion) against Stallings & Company, Inc. (Stallings), to recover commissions under an oral employment agreement and Stallings' counterclaim against Mannion and third-party complaint against Mannion Mechanical Services, Inc. (Mechanical Services), for tortious interference with contractual relations or business expectancy. Mannion appeals from the circuit court's order directing a verdict against him on his breach of contract action, and Mannion and Mechanical Services appeal from the judgment entered against them in the amount of $50,948 on Stallings' tortious interference action. We affirm.

Stallings, an Illinois corporation with offices in the City of Glenwood, Illinois, is engaged in the business of manufacturing and marketing industrial controls systems. Mannion, together with his brother James R. Mannion and Mechanical Services, own certain patents relating to energy management systems, known as the "BRDG-TNDR" systems, which control water flow in large chilled and/or hot-water systems.

On January 1, 1979, Mechanical Services, to which Mannion and his brother had granted the exclusive license to the BRDG-TNDR patent, entered into a written agreement with Stallings whereby Stall-

ings was granted the exclusive license under the patent to manufacture, use and sell BRDG-TNDR products and Stallings, in turn, agreed to pay certain flat fees and share net profits pursuant to a specified formula. From August 1977 to March 1983, Stallings employed Mannion as a salesman to work on jobs involving BRDG-TNDR systems and non-BRDG-TNDR systems.

In his breach of contract action before the circuit court, Mannion sought to recover past-due commissions for work performed on non-BRDG-TNDR jobs under an oral employment agreement. In its counterclaim and third-party claim, Stallings sought to recover damages for Mannion's and Mechanical Services' interference with its contractual relations or prospective business relations with a third party pursuant to its rights under the BRDG-TNDR patent.

At trial, the following evidence was presented in Mannion's breach of contract action. Mannion testified that around the time he accepted his employment with Stallings, he had a conversation with Thomas Stallings, Stallings' president, wherein they discussed that Mannion would "come to work for Mr. Stallings *** and that [they] would share fifty-fifty in the proceeds from the work that [Mannion] developed *** in the expansion of these present products and new system-oriented products." Mannion testified that they agreed that he would receive a $20,000 annual salary plus necessary sales expenses and the use of an automobile. He also testified that during his employ with Stallings, he received commissions on non-BRDG-TNDR items, which were computed under a formula using a 30% discount from the job profit to account for overhead, leaving a residual of 70% of the job profit to be divided on an equal basis between Stallings and himself.

On cross-examination, Mannion responded affirmatively to whether it was his understanding that he would receive a commission on every job he "touched" at Stallings, but later clarified his answer to be "it was our agreement that any job that I matured to order as my input *** in my particular area, I would get commission on." Upon further questioning, Mannion responded "[m]y agreement with Stallings *** was that we would share in the work we did, and as defined between the two of us, which followed a basic product type line. I also had the responsibility to handle some of Mr. Stallings' lines without any commission."

On redirect examination, Mannion expounded further upon his understanding of the agreement:

> "[A]ny job that incorporated a specific system concept with, where we would build up a system, an engineer system, or sell

product that was of the Brant manufacture, OCI, Hume, so forth, the lines that I brought, and also the lines that I was to develop with Mr. Stallings, it was under these logos *** I was entitled to a commission arrangement."

Mannion offered into evidence computations prepared by Stallings' bookkeeper on two non-BRDG-TNDR jobs on which he was paid commissions and charts prepared by himself listing commissions paid to him and those due him on non-BRDG-TNDR jobs, the latter of which Thomas Stallings identified as jobs for which Stallings had received compensation. Mannion testified that between 1977 and the end of 1982, he was paid $48,374 on non-BRDG-TNDR jobs. He admitted on cross-examination that his suit sought reimbursement only for commissions accruing on non-BRDG-TNDR jobs in 1982 and 1983 and stated that, although he "worked on" numerous other non-BRDG-TNDR jobs during the years 1977-81, he received one commission check in 1977-78, probably five commission checks in 1979, one commission check in 1980, and no commission checks in 1981.

Mannion also introduced into evidence letters Stallings sent to him in 1980, 1982 and 1983 which explained the money and benefits which had been paid to him during each year. Stallings' bookkeeper testified that Mannion never complained about not receiving all the commissions due him after Stallings sent these letters.

After the court directed the verdict in favor of Stallings on Mannion's breach of contract claim, evidence was introduced on Stallings' counterclaim and third-party claim. On adverse examination, Mannion testified as follows. While he was employed by Stallings in 1982, he contacted Honeywell, Inc., located in Orlando, Florida, to sell BRDG-TNDR systems on behalf of Stallings. He traveled to Miami various times in connection with this business and was reimbursed for his expenses. Thomas Stallings and employees Ray Putzi and Julie Fink also worked on the Honeywell project. By the summer of 1982, the Honeywell job was "possibly in the bid stage." Mannion received a letter dated November 4, 1982, from Honeywell's sales representative informing him "that there are some drawings coming and that there's an additional item to be bid." The letter also referred to specifications for the Honeywell project, which indicated that the "Mannion I-S system" would be manufactured by Honeywell.

Stallings introduced into evidence a purchase order "subcontract agreement" in the amount of $171,000, which was signed by Honeywell and dated January 7, 1983. Stallings also adduced a letter sent by Honeywell to Stallings on January 20, 1983, informing it of its intent to enter into a contract for an additional $40,000 item.

Thomas Stallings testified that the Honeywell job was entered into the Stallings' computer on January 12, 1983. He could not recall having seen a signed acceptance of the Honeywell purchase order. Thereafter, Mannion and Fink began to prepare drawings for the Honeywell job.

The following was further disclosed by Mannion's testimony. Mannion believed Stallings breached the patent license agreement in October 1982 and was aware that the patent agreement contained a provision requiring a 90-day notice to the breaching party and giving the breaching party the right to cure any alleged default within the 90-day period. Mannion adduced a letter, dated January 6, 1983, and marked "received January 11, 1983," sent by James Mannion to Stallings informing it that Stallings and Mechanical Services were in breach of the patent agreement and that "[b]oth have been given the full 90 days to cure the breach." Mannion testified that Thomas Stallings informed him in early January 1983 that he had received this notice.

Mannion testified that he sent a telegram on March 1, 1983, notifying Stallings that it was in default of the patent license agreement and that he was terminating the agreement "as of January 1, 1983." Mannion also sent Honeywell a telegram on March 1, informing it that Stallings had been put on notice for patent infringement of the Mannion BRDG-TNDR patent. The telegram further stated that "to cause minimum delay Mannion Mechanical will honor the current job price and supply material and services for systems, price, conc, D $40,000 bag claim FIS $171,000."

On March 11, 1983, Mannion directed a letter to Honeywell which he understood would "hold Honeywell harmless" for any claims made by Stallings. On that date, he also submitted a bid quotation to Honeywell. Mechanical Services ultimately received the Honeywell job and was paid $211,000 upon its completion. Mannion testified that Mechanical Services received between a $5,000 and $5,500 profit on the job.

Herbert L. Dean, Stallings' accountant since 1977, testified over Mannion's objection that had Stallings performed the Honeywell job, it would have made a gross profit of $111,973, a net profit of $78,381, and, after deducting Mannion's share, a profit of $50,948. Dean further testified that Stallings incurred $33,592 in overhead even though it was not awarded the Honeywell project. Dean calculated the interest on the $84,540 total loss to be $21,125 from early 1983 through the end of 1988 at a 5% interest rate.

On Mannion's appeal from the judgment entered against

him on his breach of contract action, he contends that the circuit court erred in directing the verdict against him at the close of his case in chief. When ruling on a motion for judgment at the close of a plaintiff's case in a nonjury trial, the court must first determine whether the plaintiff has made a *prima facie* case by presenting at least some evidence on every essential element of his cause of action, and then, if he has made out a *prima facie* case, the trial judge must weigh the plaintiff's evidence to determine if he has met his burden of proof by a preponderance of the evidence. (*Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55, 407 N.E.2d 43, 44-45.) In considering the weight and quality of the evidence, the court must consider all of the evidence, including evidence favorable to the defendant, pass on the credibility of witnesses, and draw reasonable inferences from the testimony. (*Kokinis*, 81 Ill. 2d at 154, 417 N.E.2d at 44-45; *Vandevier v. Mulay Plastics, Inc.* (1985), 135 Ill. App. 3d 787, 790, 482 N.E.2d 377, 380.) If, after the weighing process, the result is the negation of some of the evidence necessary to the plaintiff's *prima facie* case, the court should enter judgment in the defendant's favor; if sufficient evidence necessary to establish plaintiff's *prima facie* case remains, the court should deny the defendant's motion. *Kokinis*, 81 Ill. 2d at 155, 407 N.E.2d at 45.

■ In directing the verdict for Stallings, the circuit court here incorrectly applied the standard set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, when it found that "in viewing the evidence in the light most favorable to [Mannion], [Mannion] has failed to sustain his burden of proof." No prejudice resulted to Mannion, however, because the court, in finding that Mannion did not satisfy his burden under the more lenient *Pedrick* standard, necessarily found that Mannion did not satisfy his burden under the standard set forth above.

■■ ■ To meet his burden in a breach of contract action, the plaintiff must establish an offer and acceptance, consideration, definite and certain terms of the contract, plaintiff's performance of all required contractual conditions, the defendant's breach of the terms of the contract, and damages resulting from the breach. (*Vandevier*, 135 Ill. App. 3d at 791, 482 N.E.2d at 380; *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.* (1977), 51 Ill. App. 3d 11, 14, 365 N.E.2d 316, 318.) In reviewing the circuit court's finding that plaintiff did not sustain his burden of proof as to these elements by a preponderance of the evidence, we are mindful that a reviewing court will not reverse its decision unless it is contrary to the manifest weight of the evidence. (*Vandevier*, 135 Ill. App. 3d 787, 482 N.E.2d 377.) Man-

nion argues that the circuit court's finding is against the manifest weight of the evidence because he presented sufficient evidence as to each of the above-mentioned elements. Stallings, on the other hand, argues that there is insufficient evidence to show a meeting of the minds between the parties, definite and certain terms of the contract, or valid consideration.

The record discloses conflicting and vague evidence regarding the terms of the contract. Mannion first testified that his understanding of the oral agreement was that he would receive a commission on every job he "touched" at Stallings, then testified that he would receive a commission on "any job that [he] matured to order," and subsequently admitted that he had responsibility to handle some lines without any commission. He submitted only two computations prepared by Stallings' bookkeeper reflecting commissions he received on non-BRDG-TNDR jobs and admitted that he received only one or no commission checks in four of the five years previous to the years in which he alleges commissions are due.

The record further reveals little evidence to show a meeting of the minds of the parties. What is required to establish a "meeting of the minds" is " 'a common definite meeting of intent of two parties, in selecting or accepting *** those items essential to a complete contract, as their contract. *** It must be shown that those parties selected and concurred in the terms of contract ***.' " (*Richton v. Farina* (1973), 14 Ill. App. 3d 697, 704, 303 N.E.2d 218, 223, quoting *Bartlett v. Lauff* (1933), 271 Ill. App. 551, 554.) While Mannion testified to his understanding of the agreement concerning the "sharing" of the work performed through the commission arrangement, he never testified to specific representations made by Thomas Stallings during their discussions at the time they entered into the oral employment agreement.

In light of the insufficient and vague evidence as to the terms of the oral contract and the parties' mutual assent to the terms, we cannot conclude that the circuit court's finding that Mannion failed to sustain his burden as to the essential elements of his breach of contract claim is against the manifest weight of the evidence.

We turn now to Mannion's and Mechanical Services' appeal of the judgment entered against them on Stallings' action for intentional interference with contract or business expectancy. The elements of the tort of intentional interference with contractual rights include (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of this contractual relation, (3) the defendant's intentional and unjustified inducement of a

breach of the contract which causes a subsequent breach by the other, and (4) damages. (*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 545 N.E.2d 672.) The elements of the tort of intentional interference with a business expectancy include (1) the existence of a valid business expectancy by plaintiff, (2) the defendant's knowledge of the expectancy, (3) the defendant's intentional and unjustified interference which prevents the realization of the business expectancy, and (4) damages. *Madonna v. Giacobbe* (1989), 190 Ill. App. 3d 859, 546 N.E.2d 1145; *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137.

Mannion and Mechanical Services initially argue that insufficient evidence was presented to prove the existence of a valid contract or business expectancy. They point out that Stallings did not adduce a signed contract between Stallings and Honeywell regarding the Honeywell job.

▬ ▬ In an action for tortious interference with business expectancy, the plaintiff need not prove the existence of a valid contract, but must demonstrate his reasonable expectancy of entering into a valid business relationship. (*Malatesta v. Leichter* (1989), 186 Ill. App. 3d 602, 542 N.E.2d 768; *Heying*, 126 Ill. App. 3d 157, 466 N.E.2d 1137.) The record discloses that Stallings had the exclusive right under terms of the patent license agreement to manufacture and market the BRDG-TNDR products and that it possessed this right at the time of Mannion's interference. Even accepting that Stallings was effectively notified of a possible breach as early as January 1983, the license agreement's provision providing Stallings with 90 days to cure any breach had not expired at the time of Mannion's interference on March 1, 1983. The record further discloses that in the summer of 1982, the Honeywell job was in the "bid stage," that in November 1982 Stallings received a letter from Honeywell outlining specifications for the job which indicated that the "Mannion I-S system" would be manufactured by Honeywell, and that in January 1983 Stallings received a purchase order subcontract agreement signed by Honeywell specifying the amount of compensation to be given to Stallings. We believe this evidence amply supports the circuit court's finding that Stallings had a reasonable expectancy of entering into a valid business relationship.

▬ Sufficient evidence was also presented to support the circuit court's finding that Mannion had knowledge of the business expectancy and that Mannion's interference prevented the realization of the expectancy. Mannion acknowledged that he worked on the Honeywell project for Stallings throughout the stages mentioned above, that

Stallings was in the "bid stage" with the Honeywell project in the summer of 1982, and that he received the November 1982 letter containing job specifications which indicated that the "Mannion I-S system" would be included in Honeywell's manufacture of its product. Mannion also admitted that he submitted a bid quotation to Honeywell 10 days after he informed it that Stallings had been notified of patent infringement and that Mechanical Services ultimately entered into an identical purchase agreement with Honeywell.

As to the element that the defendant's actions be intentional and unjustified, no dispute exists here that Mannion's interference was intentional. In dispute, however, is whether Mannion's conduct was justified or privileged and who bore the burden of pleading and proving the justification or lack of justification. Mannion claims that he was conditionally privileged to interfere in Stallings' contractual relations and that Stallings bore the burden of overcoming the privilege. Stallings, on the other hand, denies the existence of a privilege and argues that Mannion has waived any claim of privilege by failing to raise it in his pleadings or at trial.

Our supreme court has recently dispelled any confusion regarding the parties' burden as to pleading and proving a justification or lack of justification in actions for tortious interference with contractual relations or business expectancies. Where the conduct of a defendant is privileged, the plaintiff is required to plead and prove that the defendant's actions were done without justification or with actual malice. (*HPI*, 131 Ill. 2d 145, 545 N.E.2d 672; *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 552 N.E.2d 973.) The court, however, has offered little guidance regarding the determination of the existence of a privilege. Illinois courts generally recognize privileges in instances where the defendant has acted to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights. (*HPI*, 131 Ill. 2d at 157, 545 N.E.2d at 677.) Courts have found the following actions to involve such interests: acts involving the first amendment right to petition government for redress of grievances (*Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 229 N.E.2d 514; *King v. Levin* (1989), 184 Ill. App. 3d 557, 540 N.E.2d 492); the reporting of the unauthorized practice of medicine by a veterinary member (*American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 435 N.E.2d 1297); evaluations by hired professional consultants (*Genelco, Inc. v. Bowers* (1989), 181 Ill. App. 3d 1, 536 N.E.2d 783); an attorney's rendering advice to his client (*Schott v. Glover* (1982), 109 Ill. App. 3d 230, 440

N.E.2d 376); and a corporate officer acting to influence the actions of his corporation (*Mittelman*, 135 Ill. 2d 220, 552 N.E. 2d 973; *HPI*, 131 Ill. 2d 145, 545 N.E.2d 672; *Swager v. Couri* (1979), 77 Ill. 2d 173, 395 N.E.2d 921). These courts, in granting the defendant a qualified privilege and placing the difficult burden on the plaintiff to overcome the privilege, have carefully balanced the defendant's interests with the plaintiff's interests and found significant policy reasons for granting a qualified privilege.

■ Mannion and Mechanical Services assert that their property interest in the BRDG-TNDR patent gave rise to a conditional privilege to interfere in Stallings' prospective business relationship with Honeywell, despite Stallings' undisputed allegations and proof that it had the exclusive right under the BRDG-TNDR patent to manufacture and sell the BRDG-TNDR products. They have cited no case law in their brief which has found a defendant's mere property or economic interest to be an equal or greater interest than the plaintiff's contractual rights or valid business expectancies. The case relied on by Mannion and Mechanical Services at oral argument, *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 545 N.E.2d 672, does not support their contention. *HPI* involved the well-recognized "corporate officer privilege." The duty of corporate officers to their corporations' shareholders to use their business judgment and discretion on behalf of the corporation has been deemed by courts to take precedence over any duty they may have towards parties contracting with the corporation. (See *Swager*, 77 Ill. 2d at 187-92, 395 N.E.2d at 927-28; *Mittelman*, 135 Ill. 2d 220, 552 N.E.2d 973.) Since this privilege arises from an officer or employee's inducement of his own corporation's breach of contractual or prospective business relations with other parties, it is inapplicable to the instant circumstances.

We note that our research has disclosed an appellate court case, *Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 102, which recognized the societal value of free enterprise in granting a privilege of lawful economic competition where the defendant is interfering with a competitor's prospective business relationship rather than an existing contract.[1] This "competitor's privi-

---

[1]The court distinguished between interference with an existing contract and interference with a prospective economic advantage because "[w]hen a business relationship affords the parties no enforceable expectations, but only the hope of continued benefits, the parties must allow for the rights of others." It further explained "as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases." *Belden*, 90 Ill. App. 3d at 552, 413 N.E.2d at 102.

lege" arises when the business relation concerns a matter involving competition between the actor and the competitor. (See *Candalaus Chicago, Inc. v. Evans Mill Supply Co.* (1977), 51 Ill. App. 3d 38, 48, 366 N.E.2d 319, 326-27, citing Restatement of Torts §768 (1934).) In contrast, Stallings here alleged and proved that it had the exclusive right under the patent to manufacture and sell the BRDG-TNDR products and that Mannion's relation to the Honeywell project arose from his employment relationship with Stallings.

Accordingly, because defendant has provided no basis upon which to invoke the existence of a privilege here, we hold that plaintiff was not required to allege facts from which actual malice may be inferred.

■■ Mannion and Mechanical Services next argue that they should be granted a new trial because the trial court committed reversible error in allowing Stallings' damage expert to testify despite his failure to comply with the order excluding witnesses from the courtroom during other witnesses' testimony. While Mannion concedes that it is not reversible error to allow a witness to testify despite a violation of an order excluding witnesses unless there is a showing of prejudice (*People v. Fiorito* (1952), 413 Ill. 123, 108 N.E.2d 455), he has not made any showing of prejudice to justify a reversal here. As noted by the circuit court, Stallings' accountant testified to accounting procedures as applied to the Honeywell project, not as to factual or credibility matters. Under these circumstances, the circuit court's decision to permit the accountant to testify was not an abuse of its discretion.

■■ Finally, we address Mannion's contention that he may not be held personally liable for Mechanical Services' tortious interference with Stallings' business expectancy due to his status as a corporate officer of Mechanical Services. It is established that, although corporate officers generally are not liable for the obligations of the corporation, they are personally liable to a victim of a tort for damages resulting from their personal participation in the tort. (*National Acceptance Co. of America v. Pintura Corp.* (1981), 94 Ill. App. 3d 703, 418 N.E.2d 1114; *McDonald v. Frontier Lanes, Inc.* (1971), 1 Ill. App. 3d 345, 272 N.E.2d 369; *Miller v. Simon* (1968), 100 Ill. App. 2d 6, 241 N.E.2d 697.) Mannion's reliance on *Motsch v. Pine Roofing Co.* (1988), 178 Ill. App. 3d 169, 533 N.E.2d 1, as recognizing a contrary rule is misplaced. *Motsch* acknowledged the rule that a corporate officer may be held liable for torts in which he participates, but noted that the statutory cause of action in issue there expressly limited liability to persons serving in the specific capacity of an "employer." (*Motsch*, 178 Ill. App. 3d at 176, 533 N.E.2d at 6.) Because no dispute

exists that Mannion personally participated in the common law tort present here, we find that Mannion may be held personally liable.

In summary, we affirm the circuit court's order directing the verdict against Mannion on his breach of contract action and the judgment entered against Mannion and Mechanical Services on Stallings' action for tortious interference with business expectancy.

Affirmed.

CAMPBELL and MANNING, JJ., concur.